USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/7/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                       :
JOHN INTONATO,                                         :       **OPINION AND ORDER**
                                                       :
                           Plaintiff,                  :
          -- v. --                                     :       13 Civ. 3426 (JLC)
                                                       :
CAROLYN COLVIN, COMMISSIONER                           :
OF SOCIAL SECURITY,                                    :
                                                       :
                           Defendant.                  :
-------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff John Intonato brings this action seeking judicial review of a final determination

by Defendant Carolyn Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying Intonato's application for disability insurance benefits ("DIB"). The parties have cross-

moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure. For the reasons set forth below, Intonato's motion is granted, the Commissioner's

cross-motion is denied, and the case is remanded to the Commissioner for further proceedings.

## I.    BACKGROUND

**A. Procedural History**

Intonato filed an application for DIB on October 12, 2011. Administrative Record

("Rec.") (Dkt. No. 11), at 117-23.[1] Intonato claimed disability beginning on June 14, 2010, *id.* at

117, due to cervical and lumbar stenosis, cervical cord compression, anxiety, depression, a

partial right kidney removal, a right incisional hernia, chronic abdominal pain, and sleep apnea,

*id.* at 148. The Social Security Administration ("SSA") denied his claim on January 20, 2012.

---

[1] The Administrative Record is divided into ten separate docket entries (Dkt Nos. 11-1 to 11-10).
Citations to the Administrative Record refer to the bold page numbers in the lower right-hand
corner, which run sequentially throughout the docket entries.

*Id.* at 89-100. On March 2, 2012, Intonato filed a request for a hearing before an Administrative

Law Judge ("ALJ"). *Id.* at 101-03. Represented by counsel, he appeared and testified at a

hearing held before ALJ Michael A. Rodriguez on May 2, 2012. *Id.* at 33-74. The ALJ found

that Intonato was not disabled and denied his claims in a written decision dated July 17, 2012.

*Id.* at 17-32. The SSA Appeals Council received Intonato's request for a review of the ALJ's

decision on September 19, 2012. *Id.* at 13-16. The Council denied review on March 20, 2013,

rendering the ALJ's determination the Commissioner's final decision. *Id.* at 1-7.

Intonato timely commenced the current action on May 21, 2013, seeking judicial review

of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). *See* Complaint ("Compl.") (Dkt.

No. 1). On December 28, 2013, the Commissioner filed her Answer. (Dkt. No. 10). Intonato

moved for judgment on the pleadings pursuant to Rule 12(c) on March 21, 2014. *See* Notice of

Motion (Dkt. No. 15); Plaintiff's Memorandum of Law ("Pl. Mem.") (Dkt. No. 17). The

Commissioner filed a response on May 16, 2014, and cross-moved for judgment on the

pleadings. *See* Notice of Motion (Dkt. No. 22); Memorandum of Law in Support of the

Defendant's Motion for Judgment on the Pleadings ("Def. Mem.") (Dkt. No. 23). Intonato did

not submit any reply.

## B. The Administrative Record

### 1. Intonato's Background

Born on September 26, 1968, Intonato was 41 years old on the alleged disability onset

date and 43 years old at the time of his application for DIB. Rec. at 117, 145, 192. He is not

married and has no children, and, as of his administrative hearing, lived in West Nyack, New

York with his brother, his brother's wife, and their two children. *Id.* at 39-41. Intonato has

completed some coursework at a community college and also received a medical assistant

2

certification in 1997. *Id.* at 43, 179. After receiving his medical assistant certificate, Intonato

worked consistently as an ophthalmic technician for three different medical groups. *Id.* at 43-44,

150, 173, 179. In June 2010, he left his most recent position, where he had worked since 2004.

*Id.* at 57-58, 173, 179-80. According to Intonato, he left this position because he was "verbally

abused" by his employer for taking time off to care for his mother in the hospital. *Id.*

　　　At his administrative hearing and in his submissions to the SSA, Intonato described his

day-to-day activities. Intonato spends several hours each day watching television. *Id.* at 61, 163.

He makes quick meals for himself, but does not cook anything that requires long periods of

standing or clean-up. *Id.* at 61, 161-62. Intonato explained that he cleans around the house, but

requires some assistance to do so. *Id.* at 162. Sometimes, he watches his nephew at home. *Id.* at

62. Intonato also testified that he is able to drive and occasionally goes to the library to read a

newspaper or use a computer. *Id.* at 61-62; *see also id.* at 163. He explained that, while he is

able to shop for clothes and food, he does so "very seldom." *Id.* at 163. At his hearing, he

testified that he has no difficulty taking care of his personal needs, including shaving, bathing, or

putting on clean clothes every day. *Id.* at 71; *but see id.* at 160-61. Despite living with his

brother, Intonato claimed that he spends much of his time alone and that he does not socialize

with family or friends very often. *Id.* at 164. Once a month, he has dinner with his family, but

otherwise, he avoids family functions; Intonato explained that his anxiety and depression have

distanced him from his family. *Id.* Similarly, he said he meets friends about once a week, but

his anxiety and discomfort increases around large groups of people. *Id.* at 72-73, 171. Such

events lead to panic attacks, which Intonato claimed occur on a daily basis and consist of fear,

rapid heartbeat, sweating, and confusion. *Id.* at 170.

Regarding his symptoms, Intonato explained that he is unable to sit or stand longer than 15-20 minutes at a time before he becomes uncomfortable and has difficulty concentrating. *Id.* at 47, 66, 160. Intonato testified that when he stands for 10 to 15 minutes, he experiences pain, numbness, and tingling in his shoulders and arms, particularly on his right side. *Id.* at 47-49. He also said he has a limited ability to walk because of his pain. *Id.* at 64, 166. Intonato said that it is painful to bend over while dressing, stand while taking a shower, and sit during meals. *Id.* at 160-61. For his pain, he wears an abdominal binder and takes Advil or Aleve. *Id.* at 168-69. Finally, Intonato noted that he has had sleep apnea, which interferes with his ability to breathe while sleeping and makes him tired during the day. *Id.* at 71-72, 160.

### 2. Medical Evidence in the Record

#### a. Medical History

##### i. Sleep Apnea

Intonato was diagnosed with severe obstruct sleep apnea ("OSA") on November 15, 1999, after undergoing an overnight polysomnography study. Rec. at 261-62. At the request of Dr. Stephen Menitove,[2] Intonato underwent three more such studies in July 2005, *id.* at 246-51; October 2009, *id.* at 244-45; and November 2011, *id.* at 366-69. To treat his OSA, Intonato uses continuous positive airway pressure treatment and, in November 2009, had a tonsillectomy and surgery to remove throat tissue and reduce his tongue base. *Id.* at 237, 366. However, as of Intonato's November 2011 polysomnography study, his sleep apnea was still described as "severe." *Id.* at 366-67.

---

[2] Dr. Menitove does not list his specialization, although his medical group's letterhead suggests he is a pulmonologist. The group is called "Rockland Pulmonary & Medical Associates," and he is listed as an "FCCP" (Fellow of the American College of Chest Physicians). *Id.* at 231.

4

### ii.   Partial Nephrectomy and Incisional Hernia

While hospitalized for kidney stones in January 2011, Intonato underwent a CT scan which showed a possible cyst on his kidney. *Id.* at 222, 227-28, 276, 278-80. An MRI performed the following month confirmed the mass, *id.* at 220, 229, and, in March 2011, Intonato had a partial nephrectomy to remove the mass and his right adrenal gland. *Id.* at 237, 380, 394. As a result of the surgery, Intonato developed a "large right-sided incisional hernia." *Id.* at 237, 363, 380.

Accordingly, Dr. Menitove then referred Intonato to Dr. Fleischer, a surgeon. *Id.* at 400-01. At his May 4, 2011 appointment with Dr. Fleischer, Intonato characterized his pain as mild but aggravated by exertion, and reported that it interfered with his daily activities. *Id.* at 400. Dr. Fleischer noted that an abdominal CT scan of Intonato on May 1, 2011 showed a "large incisional hernia." *Id.* Dr. Fleischer also noted that Intonato was severely morbidly obese, and therefore advised him to lose significant weight before surgery because his obesity put him at high risk for a recurrent hernia and pulmonary complications. *Id.* at 400-01. Nevertheless, Dr. Fleischer scheduled Intonato for surgery on May 19, 2011. *Id.* at 398. To that end, Intonato went to Dr. Peter Strassberg, who had been treating Intonato since April 2011, *id.* at 291-92, for pre-operative testing, *id.* at 396, 398, 406. Intonato did not have the surgery as scheduled, although it is not entirely clear why. *Id.* at 393.[3] In a June 6, 2011 note, Dr. Strassberg commented that Intonato would try over-the-counter medication for his hernia pain. *Id.* at 389.

In July 2011, Intonato again explored the possibility of surgery for his hernia. On July 1, Intonato saw Dr. Menitove for a pre-operative consultation requested by Dr. Eva Fischer, a

---

[3] Although the Commissioner states that Intonato cancelled the surgery himself, Def. Mem. at 3, the report from Dr. Strassberg's office to which they cite for this fact does not mention who cancelled the surgery. Rec. at 393.

surgeon. *Id.* at 237. Dr. Menitove determined that Intonato was "a suitable candidate for operative intervention for repair of an incisional hernia." *Id.* at 238. On July 21, Intonato visited Dr. Strassberg, who also found that there were no medical contraindications to surgery. *Id.* at 382-84. As such, in July 2011, Intonato had his incisional hernia surgically repaired. *Id.* at 422.

The hernia recurred. An abdominal and pelvic CT scan performed on September 11, 2011 showed a "[p]ersistent right flank post operative hernia." *Id.* at 377-78. When Intonato saw Dr. Strassberg three days later to discuss the results of the CT scan, Dr. Strassberg commented that Intonato was "doing well," but also noted the hernia. *Id.* at 376.[4] While not fully supported by the medical evidence in the record, Intonato testified during his administrative hearing that he has developed four new hernias, including a large incisional hernia and an umbilical hernia. *Id.* at 51-54. On June 22, 2012, Dr. Andrew Moulton, an orthopedic surgeon, noted the presence of a right incisional hernia. *Id.* at 477, 480.

### iii.  Cervical and Lumbar Spine

Intonato also suffers from spinal issues. A January 14, 2009 MRI showed that Intonato had "[e]arly disc degeneration," with a C3-4 "disc herniation," "[c]anal stenosis at C4-5 through C6-7," and multi-level spinal cord compression. *Id.* at 204. On October 26, 2011, Dr. Strassberg noted that Intonato's cervical spine stenosis would require surgery. *Id.* at 374. While the need for surgery was in the record before the ALJ, Intonato did not mention at his hearing that he had cervical spine surgery scheduled for June 2012. Pl. Mem. at 3. After the hearing, Intonato underwent a second cervical spine MRI on May 30, 2012 which revealed osteophyte complexes at multiple levels, "resultant severe spinal stenosis" and "significant spinal cord compression" at

---

[4] In her brief, the Commissioner wrote that Dr. Strassberg noted Intonato was "doing well," Def. Mem. at 3 (citing Rec. at 376). While Dr. Strassberg's handwriting is not clear, this seems to be a reasonable interpretation of the record.

C5-6, and "moderately severe spinal stenosis" with "impingement and flattening and mild compression of the cervical spinal cord" at C6-C7. Rec. at 419. An MRI of his lumbar spine performed the same day revealed "[m]ultilevel degenerative changes," including the possibility of impingement on the L5 nerve roots. *Id.* at 452. On June 28, 2012, Dr. Moulton performed a cervical fusion from C2 to T2. *Id.* at 467-68.

### b. Physician Assessments

#### i. Dr. Peter Strassberg's Assessments

Dr. Strassberg completed two assessment forms in connection with Intonato's DIB application. *Id.* at 290-304, 371-72. He treated Intonato from April 2011 through at least March 24, 2012, *id.* at 291, 370, and, in January 2012, the SSA's consultative physician identified Dr. Strassberg as Intonato's primary care physician, *id.* at 345.

In the first assessment form, dated October 26, 2011, Dr. Strassberg listed the following diagnoses/symptoms: a right abdominal hernia due to a previous surgery, cervical spine "compression/stenosis" with "peripheral neuropathy" in both arms,[5] depression, and anxiety. *Id.* at 291. Dr. Strassberg characterized Intonato's symptoms as static and lifelong, with no improvements since his first visit in April 2011. *Id.* at 292, 297. He observed that Intonato had a decreased range of motion in the cervical spine and tingling in "both extremities." *Id.* at 293-94. However, he noted that Intonato had no significant abnormality in his gait and required no orthotic appliance or assistive device to walk. *Id.* at 294-96.

---

[5] The Commissioner wrote that Dr. Strassberg diagnosed Intonato with "necropathy," not "neuropathy." Def. Mem. at 3. While Dr. Strassberg's handwriting is unclear, neuropathy, which is pain or numbness due to nerve damage, better matches Intonato's diagnoses than necropathy, which relates to tissue death or gangrene. Neuropathy also conforms with the definition that the Commissioner provides: "nerve damage to the hands and feet." *Id.*

Dr. Strassberg found that, while Intonato had no physical or objective signs of chronic fatigue, Intonato experienced fatigue from daily activities as a result of his anxiety and depression. *Id.* at 293. Dr. Strassberg did not mention Intonato's history of sleep apnea. *Id.* Anxiety and depression were the only limitations Dr. Strassberg identified regarding Intonato's mental status, which Dr. Strassberg said affected Intonato's mood. *Id.* at 292, 297. Dr. Strassberg identified Intonato's anxiety, depression, and hernia as presenting difficulties for his functioning in a work setting. *Id.* at 298.

Based on his medical findings, Dr. Strassberg determined that Intonato could lift and carry ten pounds "occasionally," that is, up to one-third of the work day. *Id.* at 299. He further determined that Intonato could stand and/or walk for less than two hours per day and sit less than six hours per day. *Id.* While Dr. Strassberg indicated in the report that Intonato had no limitation in his ability to push and/or pull, *id.* at 300, he also wrote that Intonato's hernia limited his ability to push and pull, *id.* at 301.

On March 22, 2012, Dr. Strassberg filled out a second assessment form. *Id.* at 371-72. In the form, hernia, cervical spinal cord compression, sleep apnea, anxiety, and depression are listed as Intonato's medical conditions. *Id.* at 371.[6] On a chart that divided potential functional limitations into "No Evidence of Limitations," "Moderately Limited," and "Very Limited," Dr. Strassberg indicated that Intonato had moderate limitations in his ability to walk; stand; sit; lift and carry; push, pull, and bend. *Id.* at 372. Dr. Strassberg also indicated that Intonato had no limitations in mental functioning. *Id.*

---

[6] All the medical conditions are written in the same handwriting as on the forms Intonato filled out, suggesting that Intonato listed the conditions himself. *Compare* Rec. at 371 *with id.* at 159-80. Dr. Strassberg then specified his prognosis and treatment recommendations for the hernia and cervical spinal cord compression, but not for the sleep apnea, anxiety, or depression. Rec. at 371.

### ii.    Dr. Stephen Menitove's Treatment

Although Dr. Menitove treated Intonato from 1998 through December 2011 and referred

him to various specialists for care, *id.* at 154, 230-62, 359-69, 400-01, 406, Dr. Menitove did not

complete the medical questionnaire sent to him, *id.* at 305-21.  Nevertheless, many of the

medical reports in the Administrative Record belong to Dr. Menitove. *See, e.g., id.* at 230-62.

At least one specialist, Dr. Fleischer, referred to Dr. Menitove as Intonato's primary medical

doctor. *Id.* at 400.

### iii.    Independent Mental Health Status Examination by Dr. Leslie Helprin

On November 11, 2011, Intonato underwent a mental health status consultation by a

psychologist, Leslie Helprin, Ph.D. *Id.* at 422-26.  Dr. Helprin diagnosed Intonato with a

"[d]epressive disorder, NOS [not otherwise specified]" and a mildly episodic adjustment

disorder marked by anxiety. *Id.* at 425.  Dr. Helprin found that, although Intonato had mild

impairments in his attention, concentration, and memory due to cognitive limitations, he was

able to follow "simple directions and instructions and perform simple rote tasks and some

complex tasks independently" and "maintain sufficient attention and concentration for tasks."

*Id.* at 424.  Dr. Helprin concluded that her examination results were "consistent with some

secondary psychiatric problems, but in itself, this does not appear to be significant enough to

interfere with [Intonato's] ability to function on a daily basis." *Id.* at 425.

### iv.    Independent Medical Examination by Dr. Jose Corvalan

On January 3, 2012, Intonato saw Dr. Jose Corvalan, for a consultative evaluation. *Id.* at

344-47.[7]  Dr. Corvalan determined that Intonato's gait and station were normal and that he could

---

[7] While Dr. Corvalan's signature block identifies him as working in orthopedics, Rec. at 346,
Intonato disputes Dr. Corvalan's specialization, noting that the only "Jose Corvalan, M.D." he
found in an Internet search is a general surgeon. Pl. Mem. at 7.

9

squat fully. *Id.* at 345. He also noted that Intonato did not need help changing for the exam or

getting on and off the examination table, and rose from his chair without difficulty. *Id.* X-ray

studies revealed "discogenic disease" at C4/C5 and L5-S1. *Id.* at 346. Intonato had tenderness

when Dr. Corvalan touched his cervical spine, but there were no trigger points. *Id.* Intonato's

range of motion in the cervical and lumbar spine was somewhat limited, but he was able to raise

both legs during a straight leg raise test. *Id.* He had a full range of motion in his shoulders,

elbows, forearms, wrists, knees, and ankles. *Id.*

Dr. Corvalan diagnosed Intonato with upper and lower back pain, high blood pressure,

anemia, anxiety and depression, nephrolithiasis, an abdominal hernia, and hearing loss. *Id.* The

prognosis was stable. *Id.* Dr. Corvalan concluded that Intonato had mild limitations moving his

neck forward, backward, and laterally, and that he had moderate limitations in sitting and

standing for "long periods of time," walking "long" distances, bending, climbing stairs, and

heavy lifting. *Id.* at 347.

### c. ALJ Hearing

ALJ Rodriguez held a hearing on May 2, 2012 to consider Intonato's eligibility to receive

DIB benefits. *Id.* at 33-74. Intonato was represented by counsel at the hearing, and was the only

person to testify. *Id.* First, the ALJ elicited testimony about Intonato's former work as an

ophthalmic technician. *Id.* at 43-47. According to Intonato, while his job was not very

physically demanding, it required a high degree of precision and very fine manipulations, and

required him to be on his feet a lot. *Id.* at 45-47. Intonato explained that he could no longer

perform the tasks his former job required because after standing for 10-20 minutes, he

experienced discomfort from his hernia and tingling and numbness from his cervical cord

compression. *Id.* at 47-48. The ALJ also elicited testimony from Intonato about his daily

activities since he stopped working. *Id.* at 61-62. Throughout the hearing, the ALJ asked

Intonato about his various maladies and symptoms. *Id.* at 49-55. Intonato also described his

anxiety and depression. *Id.* at 59-60, 63-66. In addition, Intonato listed the prescription and

over-the-counter medicine he takes. *Id.* at 63, 66-68. Finally, Intonato identified Drs. Strassberg

and Menitove as his current treating physicians. *Id.* at 68-69. When questioned by his attorney,

Intonato described the surgical consultation he had for his hernias the day before the

administrative hearing, and the scheduled operation to repair them. *Id.* 4, 69-70.

## II.     DISCUSSION

### A. Legal Standards

#### 1.     Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the

"district court of the United States for the judicial district in which the plaintiff resides."

42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final

decision applied the correct legal standards and whether the decision is supported by substantial

evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more

than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting

*Richardson v. Perales*, 402 U. S. 389, 401 (1971)) (internal quotation marks and alterations

omitted). In weighing whether substantial evidence exists to support the Commissioner's

decision, "the reviewing court is required to examine the entire record, including contradictory

evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417

(quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). On the basis of

this review, the court may "enter, upon the pleadings and transcript of the record, a judgment

affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" *Kirkland v. Astrue*, No. 06-cv-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts*, 388 F.3d at 386).

The substantial evidence standard is a "very deferential standard of review," *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

## 2.   Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

12

In general, when assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)); *see also Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur*, 722 F.2d at 1037 (citations omitted).

### a. Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.l (2d Cir. 2013) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not employed, at the second step the Commissioner determines whether the claimant has a "severe impairment" restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the Commissioner moves on to the third step, considering whether the claimant has an impairment that is listed in Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the Commissioner will find the claimant disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues on to the fourth step, determining whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner

completes the fifth step, ascertaining whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant bears the burden of proving disability in steps one through four of the sequential analysis. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner on the fifth and final step, where she must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to "develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)).

Whether the ALJ has met his duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-cv-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-cv-5782 (FB), 2003 WL 22709204,

14

at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). This imperative remains in force even where the claimant is represented by counsel. *Perez*, 77 F.3d at 47.

### c. Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-cv-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (internal quotation marks omitted) (citing 20 C.F.R. § 404.1527(d), 416.927(d)). However, a treating physician's opinion is given controlling weight—that is, it is binding—provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see Selian*, 708 F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citing *Burgess*, 537 F.3d at 128 and *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003)). The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such a medical provider is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical evidence alone or from reports of individual examinations."
20 C.F.R. § 404.1527(c)(2).

Under certain circumstances, however, a treating physician's opinion will not be controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, No. 09-cv-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(l), 416.927(e)(l)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 32) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to the duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-cv-7727 (WHP) (SN), 2012 WL 6621731, at *13

(S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see* 20 C.F.R. § 404.1527(c)(2). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not 'exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referencing *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)).[8] The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

---

[8] On March 26, 2012, a portion of 20 C.F.R. § 404.1527 was modified. The section that described the factors for an ALJ to consider when deciding how to weigh a treating physician's opinion was moved from subsection (d)(2) to (c)(2).

The courts leave it to the finder of fact to resolve any conflicts there may be in the medical testimony, but the ALJ need not "reconcile explicitly every conflicting shred of medical testimony." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)). A court may not substitute its judgment so long as the decision of the ALJ, and ultimately that of the Commissioner, "rests on adequate findings supported by evidence having rational probative force." *Galiotti*, 266 F. App'x at 67 (quoting *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)).

### d. Claimant's Credibility

As to the credibility of a claimant, here, too, the reviewing court must defer to an ALJ's findings. *Osorio v. Barnhart*, No. 04-cv-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "In assessing a plaintiff's subjective claims of pain and other symptoms, the ALJ must first determine that there are 'medical signs and laboratory findings which show that [the claimant has] a medical impairment which could reasonably be expected to produce the pain.'" *Vargas v. Astrue*, No. 10-cv-6306 (PKC), 2011 WL 2946371, at *11 (S.D.N.Y. July 20, 2011) (quoting *Snell*, 177 F.3d at 135 and 20 C.F.R. § 404.1529(a)). So long as the "findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Vargas*, 2011 WL 2946371, at *11 (quoting *Aponte v. Sec'y of Health and Human Servs. of the U.S.*, 728 F.2d 588, 591 (2d Cir. 1984)). However, these findings must "be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena v. Astrue*, No. 07-cv-11099 (GWG), 2008 WL 5111317, at *10 (S.D.N.Y. Dec. 3, 2008) (internal quotation marks omitted) (quoting *Williams*, 859 F.2d at 260-61).

Because subjective statements about symptoms alone may not establish a disability, the ALJ follows a two-step analysis for evaluating assertions of pain and other limitations. *Genier v.*

18

*Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)).  First, the ALJ must

weigh whether "the claimant suffers from a medically determinable impairment that could

reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)).

If the answer to the first step of the analysis is yes, the ALJ proceeds to the second step,

considering "the extent to which [the claimant's] symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence of record." *Id.* (citing

20 C.F.R. § 404.1529(a)) (internal quotation marks omitted).  Because "an individual's

symptoms can sometimes suggest a greater level of severity of impairment than can be shown by

the objective medical evidence alone," the ALJ may take into account a variety of other

considerations as evidence. *Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL

374186, at *3 (SSA July 2, 1996)).  These include:  a claimant's daily activities; the location,

duration, frequency, and intensity of the claimant's pain or other symptoms; factors that

aggravate the symptoms; treatment and medication necessitated by the pain or other symptoms

and their effects; other alleviating measures taken by the claimant; and other factors that relate to

the claimant's functional limitations and restrictions stemming from pain or other symptoms. *Id.*

(citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

**B.  The ALJ's Decision**

  In his July 17, 2012 decision, ALJ Rodriguez determined that Intonato did not meet the

statutory definition of disability under the Social Security Act, and therefore denied Intonato's

DIB claims. Rec. at 29.  Following the five-step inquiry into disability, the ALJ first determined

that Intonato had not been engaged in substantial gainful activity since June 14, 2010, the date

Intonato claimed as the start of his disability.  *Id.* at 25.  At step two, the ALJ found that Intonato

had the following severe impairments:  obstructive sleep apnea, obesity, a right abdominal

incisional hernia, and degenerative disc disease of the cervical and lumbosacral spine.  *Id.*

19

However, at step three, the ALJ determined that none of these impairments met or were medically equal to the severity of any of the impairments listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P. *Id.* at 26.

The ALJ then moved on to step four, and found that, while Intonato retained the RFC for the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), he was unable to perform his past relevant work as an ophthalmic technician. *Id.* at 26-28. In reaching this conclusion, the ALJ gave substantial credence to consultative psychologist Dr. Helprin, and partial credence to Dr. Corvalan, the consultative physician, and to Intonato's treating physician, Dr. Strassberg. *Id.* at 28. Dr. Strassberg's medical opinion received only partial credence because the ALJ identified internal inconsistencies in the doctor's reports and as compared to Dr. Corvalan's findings. *Id.* The ALJ did not mention Dr. Menitove when evaluating the medical opinion evidence. *Id.* The ALJ also determined that Intonato's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not fully credible." *Id.* at 28. In particular, the ALJ noted that Intonato's characterization of his disability was belied by his chosen courses of treatment, his description of his symptoms, and his "activities of daily living." *Id.* at 27.[9]

---

[9] The ALJ appears to have based his determination of Intonato's credibility, in part, on two misstatements or mischaracterizations of the record regarding the nature of Intonato's treatments. First, the ALJ wrote that Intonato "relies solely upon over-the-counter medications for allevations [*sic*] of his pain" and has not received any injections for his neck and back pain, Rec. at 27; however, Dr. Corvalan noted that Intonato had been treated with "an epidural injection, only one so far," *id.* at 344. The ALJ also characterized Intonato's sleep apnea treatment as conservative, *id.* at 27, even though Intonato underwent surgery to alleviate his OSA, *id.* at 237, 366. Courts in this Circuit typically do not consider surgical procedures to be conservative treatment. *See, e.g., Shaw v. Chater*, 221 F.3d 126, 134-35 (2d Cir. 2000) (distinguishing between conservative therapies and "surgery or prescription drugs"); *Cohen v. Astrue*, No. 07-cv-535 (DAB) (HBP), 2011 WL 2565659, at *21 (S.D.N.Y. May 17, 2011) (plaintiff was "prescribed only conservative treatment . . . and surgery was never recommended"), *report and recommendation adopted*, 2011 WL 2565309 (S.D.N.Y. June 28, 2011). Moreover, Intonato contends that the ALJ also should have considered his obesity,

At the fifth and final step, the ALJ concluded that, taking into consideration Intonato's age, education, work experience, and RFC, a significant number of jobs that Intonato could perform existed in the national economy. *Id.* at 29.

## C. Analysis

### 1. The ALJ Did Not Fully Develop the Administrative Record

The ALJ erred by failing to fully develop the evidentiary record with regard to the medical opinions of Intonato's two treating physicians, Drs. Strassberg and Menitove. While the ALJ identified inconsistencies in Dr. Strassberg's medical opinion, he did not seek additional information from Dr. Strassberg in an effort to resolve these inconsistencies. Furthermore, the record does not reflect that the ALJ made any effort to solicit Dr. Menitove's medical opinion after receiving the doctor's medical records and a blank medical questionnaire.

#### a. Dr. Strassberg

The ALJ accorded Dr. Strassberg's opinion "partial credence" in light of an inconsistency in the doctor's report. Specifically, the ALJ noted that Dr. Strassberg's conclusion in his April 2011 report that Intonato could sit for less than six hours per day and stand/walk for less than two hours per day was inconsistent with the doctor's finding in the March 2012 questionnaire that Intonato had "moderate limitations" in these activities. *Id.* at 28. In its brief, the Commissioner highlights another inconsistency within Dr. Strassberg's April 2011 report regarding Intonato's ability to push and pull. Def. Mem. at 19-20 (citing Rec. 300-01).

---

particularly his significant weight gain, in the context of evaluating Intonato's sleep apnea as the two diseases are correlated. Pl. Mem. at 5-6, 13-14. However, as the ALJ correctly noted, Intonato's sleep apnea and weight gain are both "long-standing in nature" and predate Intonato's alleged disability onset date. Rec. at 27-28; *see also Briscoe v. Astrue*, 892 F. Supp. 2d 567, 582 (S.D.N.Y. 2012) (medical evidence predating alleged onset date generally not relevant) (citing cases).

In identifying an inconsistency within Dr. Strassberg's reports, the ALJ "triggered an obligation to take further steps to develop evidence that could resolve such an ambiguity." *Serrano v. Colvin*, No. 12-cv-7485 (PGG) (JLC), 2014 WL 197677, at *15 (S.D.N.Y. Jan. 17, 2014). "When an ALJ perceives inconsistencies in a treating physician's report, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly . . . by making every reasonable effort to re-contact the treating source for clarification of the reasoning of the opinion." *Toribio v. Astrue*, No. 06-cv-6532 (NGG), 2009 WL 2366766, at *10 (E.D.N.Y. July 31, 2009) (quoting *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) and *Taylor v. Astrue*, No. 07-cv-3469, 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008)) (internal quotation marks omitted). "The ALJ should seek such information when a medical report contains a conflict or ambiguity that must be resolved, [or] the report is missing necessary information." *Toribio*, 2009 WL 2366766, at *10 (citing 20 C.F.R § 404.1 512(e)(l)); *see also Rivera v. Barnhart*, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005). If necessary, the ALJ must act *sua sponte* in order to fulfill this duty. *Schaal*, 134 F.3d at 505; *see also Perez*, 77 F.3d at 47 ("duty exists even when the claimant is represented by counsel").

Rather than contact Dr. Strassberg or otherwise "seek out clarifying information concerning the perceived inconsistencies," *Clark*, 143 F.3d at 118 (internal quotation marks omitted), the ALJ merely noted that the report was inconsistent. Rec. at 28. He then used this determination to justify giving only partial credence to Dr. Strassberg's opinion, rejecting out of hand the portion of Dr. Strassberg's report that did not comport with a finding of "no disability," that is, the determination that Intonato could not sit for six hours and stand/walk for two hours during an eight-hour work day. Had the ALJ contacted Dr. Strassberg for clarification, the

doctor "might have been able to provide a medical explanation," *Clark*, 143 F.3d at 118, for the perceived inconsistency, perhaps by elucidating his personal definition of "moderate limitations" or by identifying changes in Intonato's symptoms between his April 2011 and March 2012 reports. Without further development of the record, the ALJ could not properly determine what weight to assign Dr. Strassberg's opinion. *See Serrano*, 2014 WL 197677, at *15; *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### b. Dr. Menitove

The ALJ similarly failed to solicit additional information from Dr. Menitove, who treated Intonato for 13 years. Rec. at 154, 361. During this time Dr. Menitove treated Intonato for respiratory issues, performed pulmonary function tests, and referred Intonato to various specialists for treatment and testing. *Id.* at 154, 230-262, 359-369, 400-401, 406. At his administrative hearing, Intonato testified that Dr. Menitove was one of his treating physicians. *Id.* at 68-69. In light of this testimony and the length of Dr. Menitove's treating relationship with Intonato, the ALJ should have considered Dr. Menitove one of Intonato's treating physicians, *see* 20 C.F.R. § 404.1502, and accordingly, should have given his opinion controlling weight (or less weight if the record so dictated). *See* 20 C.F.R. § 404.1527(c)(2); *Burgess*, 537 F.3d at 128; *Halloran*, 362 F.3d at 32. However, in his discussion of Intonato's various treating and consultative physicians, the ALJ did not evaluate Dr. Menitove's medical opinion, Rec. at 28, perhaps because Dr. Menitove did not complete the medical questionnaire sent to him, *id.* at 305-21. Dr. Menitove did, however, submit medical records reflecting his treatment and contemporaneous assessments of Intonato, *id.* at 230-62, to which the ALJ cited in his opinion, *id.* at 22-23.

To the extent the ALJ believed that, to fully evaluate the doctor's opinion, he needed a completed questionnaire from Dr. Menitove in addition to the primary source records, the ALJ had an obligation to seek out more information from Dr. Menitove. The relevant regulations provide that "the lack of the medical source statement will not make [a medical] report incomplete." 20 C.F.R. § 416.913(b)(6). However, "the Second Circuit requires the ALJ 'to seek additional information from [the treating physician] *sua sponte*.' Therefore, although there may be cases in which a treating source opinion is unavailable, the ALJ must make a reasonable effort to obtain such an opinion." *Molina v. Barnhart*, No. 04-cv-3201 (GEL), 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005) (quoting *Clark*, 143 F.3d at 118) (alteration in original) (internal citation omitted). The record does not reflect that the ALJ requested a medical opinion from Dr. Menitove in a format the ALJ may have found more useful. Given the potential importance of Dr. Menitove's opinion as Intonato's longstanding treating physician and the perceived inconsistency and ambiguity of Dr. Strassberg's report, the ALJ should have asked Dr. Menitove to supplement his records with an additional assessment of Intonato. *See Umansky v. Apfel*, 7 F. App'x 124, 127 (2d Cir. 2001) (remanding case for ALJ's failure to obtain medical source opinions to corroborate a rejected opinion); *see also Rosa*, 168 F.3d at 79 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.").

* * *

While an ALJ generally has "the authority to weigh various medical opinions and choose between them," *Scott*, 2010 WL 2736879, at *16 (internal quotation marks omitted), here the ALJ's failure to appropriately develop the record with respect to the opinions of Drs. Strassberg and Menitove (which are particularly important as they are treating physicians) led him to render

24

a determination based on an incomplete record. *See, e.g., id.* at \*13-14 (declining to uphold ALJ

decision where ALJ failed to seek out treating physician's reports and seek clarification about

ambiguous report from other doctor); *Toribio*, 2009 WL 2366766, at \*10 (remanding case for, in

part, ALJ's failure to contact treating physician again to clarify an ambiguity in report on

claimant's disability status).  Where such gaps in the administrative record exist, a remand to the

ALJ is necessary to fully develop the evidence. *See, e.g., Rosa*, 168 F.3d at 82-83 (citing *Pratts*,

94 F.3d at 39).

### 2. The ALJ Failed to Provide Good Reasons for Assigning Partial Credence to Dr. Strassberg's Opinion

It is an ALJ's "prerogative to assign an appropriate weight to the treating physician's

opinion based on a review of the entire evidentiary record." *Serrano*, 2014 WL 197677, at \*16.

However, an ALJ must "meet his obligation of comprehensively setting forth good reasons to

explain that determination." *Id.; see also Snell*, 177 F.3d at 133.  In so doing, an ALJ should be

guided by the factors detailed by the Second Circuit. *See Halloran*, 362 F.3d at 32; 20 C.F.R.

§ 404.1527(c)(2).  Here, although the ALJ considered the perceived inconsistency of one aspect

of Dr. Strassberg's March 2012 opinion with the doctor's own earlier opinion and that of

Dr. Corvalan, the ALJ failed to set forth any other "good reasons" for discounting

Dr. Strassberg's opinion.

For example, the ALJ did not discuss the length, nature, and extent of Dr. Strassberg's

relationship with Intonato.  The ALJ never acknowledged that Intonato had been Dr. Strassberg's

patient from April 2011 until at least March 2012, nor did he attempt to establish the nature or

extent of Dr. Strassberg's treatment of Intonato.  Rec. at 28.  Such information might have

influenced how the ALJ valued Dr. Strassberg's opinions, especially when weighed against the

opinions of Drs. Corvalan and Helprin, both of which were based on single, isolated consultative

examinations. Without even a cursory comparison of these basic details, the ALJ failed to

explain how he arrived at the weight given to Dr. Strassberg's opinion relative to the other

professionals. *See Guzman*, 2011 WL 666194, at *14 (ALJ did not have "good reason" to

discredit medical opinion where there was "uncertainty regarding the nature of the treatment

relationship"). In order to clarify this determination, the ALJ "should have considered,

discussed, and compared the details of the treatment relationships between each physician and

the plaintiff." *Scott*, 2010 WL 2736879, at *17 (citing 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2)).

     The ALJ's decision also does not reflect whether he took into account the specializations

of Drs. Strassberg and Corvalan, failing to mention their respective fields or how their particular

expertise might impact the value of their opinions. *See, e.g., Clark v. Astrue*, No. 08-cv-10389

(LBS), 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010) (legal error where ALJ did not

consider whether opinion was from specialist); *Veresan v. Astrue*, No. 06-cv-5195 (JG), 2007

WL 1876499, at *5 (E.D.N.Y. June 29, 2007) (remanding case because, in part, ALJ did not

indicate what weight, if any, was assigned based on fact that medical opinions were from

specialists). If either Dr. Strassberg or Dr. Corvalan were found to have expertise in treating the

kind of pain and movement limitations alleged by Intonato, this fact would have been relevant to

the ALJ's determination of the weight to accord to their respective evaluations.

     The only factor that the ALJ discussed explicitly when explaining his decision to

discount Dr. Strassberg's opinion was its inconsistency with the record. However, the ALJ gave

short shrift to this analysis. Rec. at 28. He identified only one purported inconsistency and

appears not to have considered whether Dr. Strassberg's opinion was otherwise consistent with

the record. Moreover, the ALJ discussed the single inconsistency in a conclusory manner, noting

that Dr. Strassberg's April 2011 assessment that Intonato was unable to "sit for six hours or

stand/walk for less than 2 hours do not comport with the doctor's own [March 2012]

characterizations of moderate limitations in these activities." *Id.* The ALJ further noted that

Dr. Strassberg's assessment was "inconsistent with the examination findings as noted by

Dr. Corvalan," *id.*, namely, that Intonato had a "moderate limitation for sitting and standing for

long periods of times [and] walking long distance." *Id.* at 347. In other words, the ALJ found

that Dr. Strassberg's and Dr. Corvalan's separate characterizations of Intonato as having

"moderate limitations" conflicted with Dr. Strassberg's April 2011 finding regarding Intonato's

ability to sit, stand, and walk.

However, as Intonato notes, the ALJ's opinion provides "no further explanation of what

[moderate limitation] means." Pl. Mem. at 11. Nor does Dr. Corvalan's use of the phrase

"moderate limitation" provide further clarity. Rec. at 347. The ALJ's failure to explain why he

believed that Dr. Strassberg's finding of moderate limitation was inconsistent with his earlier

opinion is of particular concern given that, on the March 2012 form, Dr. Strassberg was forced to

characterize each of Intonato's functional limitations as either "very limited," "moderately

limited," or "no evidence of limitations." *Id.* at 372. Contrary to Intonato's assertion, it is not

necessarily the case that, "[r]egardless of how you define 'moderate'," it is false that "the

inability to sit for six hours does not comport with a 'moderate' limitation." Pl. Mem. at 12.

However, because the March 2012 form provided only three levels of functional limitation, there

are reasonable interpretations of "moderately limited" that would encompass the type of

limitations Dr. Strassberg listed in his April 2011 report.[10]

---

[10] In accord with this argument, Intonato contends that the ALJ misstated the record in his
finding that Intonato has the ability to perform the full range of sedentary work because it is
inconsistent with the medical reports of Drs. Strassberg and Corvalan, both of which describe
Intonato's limitations as "moderate." Pl. Mem. at 11. Because the Court finds that the ALJ

Given the importance the ALJ placed on the ambiguous phrase "moderate limitations" for purposes of discrediting a treating physician's opinion, the ALJ needed to explain how he arrived at his conclusion. However, the ALJ provided no analysis beyond the conclusory statement that the opinions were inconsistent. "This bare and conclusory analysis constituted error." *Serrano*, 2014 WL 197677, at *17; *accord Knight v. Astrue*, No. 10-cv-5301(BMC), 2011 WL 4073603, at *10 (E.D.N.Y. Sept. 13, 2011) (ALJ failed to provide good reasons where ALJ "selectively harnessed medical evidence . . . without further elaboration or clarification"). "It is this very conflict that necessitates an explanation of why [Intonato's] opinions were not credited over the doctors with contrary opinions." *Duncan*, 2011 WL 1748549, at *18.

The ALJ's decision demonstrates that, when evaluating Dr. Strassberg's opinion, he failed to consider and comprehensively set forth the factors needed to guide his decision to accord a treating physician less than controlling weight. *See Halloran*, 362 F.3d at 32-33. Therefore, Intonato's case is remanded to the ALJ. *See Snell*, 177 F.3d at 133 ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (citing *Schaal*, 134 F.3d at 505).

## III.   CONCLUSION

For the foregoing reasons, Intonato's motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g). Specifically, on remand, the ALJ should:

---

failed to develop the record and sufficiently explain his reasons for according less than controlling weight to Dr. Strassberg's opinion, it is unnecessary to reach the question as to whether moderate limitations and sedentary work are mutually exclusive.

28

(1)     Request from Dr. Strassberg an explanation and clarification concerning the ambiguities and/or inconsistencies identified within the April 2011 medical report, and between the April 2011 and March 2012 reports;

(2)     Provide a clear and comprehensive definition of what the ALJ understands the word "moderate" to mean when applied to functional limitations;

(3)     Determine what weight should be given to Dr. Strassberg's opinion, if it is not deemed to be controlling, based on the appropriate factors outlined above and provide a clear and comprehensive statement of the reasons for reaching this decision;

(4)     Obtain from Dr. Menitove a completed medical questionnaire or similar testimony regarding Intonato's symptoms and functional limitations;

(5)     Determine what weight should be given to Dr. Menitove's opinion, if it is acquired and not deemed to be controlling, based on the appropriate factors outlined above and provide a clear and comprehensive statement of the reasons for reaching this decision; and

(6)     Reevaluate Intonato's credibility based on an accurate characterization of his treatment and this further development of the record, as described above.

The Clerk of the Court is directed to close docket entries 15 and 22.

**SO ORDERED.**

Dated: New York, New York
       August 7, 2014

_____
JAMES L. COTT
United States Magistrate Judge

29